UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK A. PASCHAL,

    Plaintiff,

v.

CITY AND COUNTY OF SAN FRANISCO, et al.,

    Defendants.

Case No. 22-cv-03604-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 36

Defendants City and County of San Francisco ("the City"), Diego Sanchez, and Adrian Putra (collectively "the defendants") move to dismiss a Second Amended Complaint ("SAC") brought by plaintiff Mark Paschal, who alleges that the defendants discriminated against him based on his race and otherwise violated his constitutional rights when San Francisco's Office of Short-Term Rentals ("OSTR") denied his application to run a short-term rental business out of his home. The SAC is largely unchanged from Paschal's First Amended Complaint ("FAC"), and for the same reasons that I dismissed the FAC I will dismiss the SAC. It does not state facts that plausibly allege violations of the First or Fourteenth Amendments to further *Monell* or section 1983 claims. It does not state a claim under Title VI of the Civil Rights Act of 1964. Although the SAC clarifies that the final claim is asserted under California Government Code section 815.2, Paschal has not alleged any wrongdoing by Sanchez or Putra for which the City could be liable. Because Paschal did not make any substantive attempt to cure the deficiencies that I previously identified and because amending his claims would be futile, they are DISMISSED with prejudice.

## BACKGROUND

Paschal, who is African American, owns a home located on Hayes Street in San Francisco. SAC [Dkt. No. 33] ¶ 7. In 2015, he and his sister began operating a short-term rental business out

1    of that location. *Id*. ¶ 21.

2       As with Paschal's prior complaint, "[t]o understand the context of his claims, one must
3    understand the statutory and regulatory scheme under which they arise." *See* Order Granting Mot.
4    to Dismiss ("First MTD Order") [Dkt. No. 29] 1:27-2:1. This scheme is set forth in San Francisco
5    Ordinance No. 218-14 governing short-term residential rentals, for which the defendants request
6    judicial notice. *See* Defs.' RJN [Dkt. No. 36-1] Ex. A. I will take notice because the facts within
7    can be accurately and readily determined from sources whose accuracy cannot reasonably be
8    questioned and because "[m]unicipal ordinances are proper subjects for judicial notice." *See* Fed.
9    R. Evid. 201(b)(2); *Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007)
10   (citation omitted). The full framework is described in my prior Order dismissing Paschal's claims,
11   which I incorporate by reference here. *See* First MTD Order at 2:2-3:4. Briefly:

12      Permanent residents of San Francisco may offer their homes as short-term rentals under
13   certain conditions. Defs.' RJN, Ex. A, S.F. Ord. No. 218-14 at 1:3-11 (Oct. 27, 2014). They may
14   do so if, among other things, they (1) occupy the home for no less than 275 days out of the
15   calendar year in which the home is rented as a short-term residential rental and (2) maintain
16   records for two years demonstrating compliance with the relevant laws, "including but not limited
17   to information demonstrating primary residency," the number of days per calendar year that they
18   occupied the home, and the number of days that it was rented. S.F. Admin. Code § 41A.5(g)(1).

19      Residents must apply for a short-term rental certificate that "shall contain information
20   sufficient to show" that their home is their primary residence and that they are the home's
21   permanent resident. *See id.* § 41A.5(g)(2)(C), (3)(A). Primary residency "shall be established by
22   showing the residential unit is listed as the applicant's residence on at least two of the following:
23   motor vehicle registration; driver's license; voter registration; tax documents . . . or utility bill."
24   *Id*. § 41A.5(g)(3)(A). The city's Planning Department "may require any other additional
25   information necessary to show" compliance with the short-term residential provisions. *Id*. If a
26   resident's application is approved, their certificate lasts for two years, at which point they may file
27   a renewal application that contains "sufficient information to show that the applicant is the
28   permanent resident and has occupied the unit for at least 275 days of each of the two preceding

calendar years." *See id*.

After renting Paschal's home since 2015, Paschal and his sister submitted a renewal application in June 2019. *See* SAC ¶¶ 55-56. They never received a response. *Id*. ¶ 56.

Paschal and his sister reapplied in February 2021. *Id*. ¶ 62. Again, they received no response. *Id*. ¶ 63. By this point, the COVID-19 pandemic had begun. *See id*. ¶ 62. Concerned that the pandemic had "essentially shut the industry down" and by the lack of response from the OSTR, the Paschals placed an ad for a "lodger" tenant "[t]o keep some form of income coming in." *Id*. ¶ 64. Two weeks later, they removed the ad "due to a change of heart." *See id*. ¶ 65.

On May 13, 2021, the OSTR denied Paschal's application "because of the two week ad placed in February." *Id*. ¶ 67. In its denial letter, the OSTR told Paschal that "[b]ased on a review of publicly available information . . . it appears that you are not the permanent resident of the residential unit . . . being offered for short-term rentals." *Id*. ¶ 79 (citing Ex. 4).[1] The letter said that it did not appear that Paschal lived in the unit for at least 275 nights in 2020, citing a Zillow listing offering the apartment as a "semi-furnished long-term rental" that was "available for immediate occupancy." *See id*. ¶ 79; Ex. 4. It also noted that per public records, Paschal was registered to vote at another address, located on Peralta Avenue in San Francisco. *See id.*, Ex. 4.

Paschal, who denies ever moving from his home, requested a meeting with OSTR and the mayor. *Id*. ¶¶ 66, 75. In June 2021, he met with Putra, who denied his application, and Sanchez, Putra's supervisor. *See id*. ¶¶ 77-78. Putra said that the "primary concern were rules that mandated the host live in an apartment the required number of days a year," and that records showed that Paschal was registered to vote at another address. *Id*. ¶ 78. Paschal alleges that Sanchez and Putra ignored his driver's license, which listed the Hayes Street address as his

---

[1] I will consider the letter without converting the motion to dismiss into one for summary judgment, as the letter is both attached to the SAC and incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials— documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.") (citations omitted). The letter's contents are described and it is integral to Paschal's complaint. *See Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018) ("Although mere mention of the existence of a document is insufficient to incorporate the contents of a document, the document is incorporated when its contents are described and the document is integral to the complaint.") (citation and quotation marks omitted).

3

residence. *Id*. ¶ 80.

Paschal alleges that Putra and Sanchez discriminated against him because of his race in denying his short-term rental certificate. *Id*. ¶ 83. He filed a complaint of racial discrimination and unfair business practices against the OSTR. *Id*. ¶ 84. Despite doing so, he alleges, Sanchez still heard Paschal's appeal of the denial of his short-term rental certificate, during which Sanchez asked "retaliatory arbitrary questions." *See id*. ¶¶ 3, 85, 94. Paschal alleges that these questions, including whether a stove in his home was permitted, "were not asked [of] any other applicants or appellant but meant to harass" him. *See id*. ¶¶ 92-95.

In June 2022, Paschal filed this suit against the City, OSTR, and five Doe defendants, alleging a *Monell* claim, a violation of 42 U.S.C. § 1983 based on the Equal Protection Clause, retaliation under Title VI of the Civil Rights Act, and "public entity liability: acts and omissions of employees." Dkt. No. 1. After the defendants filed a motion to dismiss, Paschal filed the FAC, adding Putra and Sanchez as defendants. Dkt. Nos. 7, 17.

Upon a motion from the defendants, I dismissed the claims in the FAC, but granted Paschal leave to amend all but his Title VI against Sanchez, which was dismissed with prejudice because such a claim cannot lie against an individual. Dkt. No. 29. After Paschal filed the SAC—asserting the same *Monell*, section 1983, and Title VI claims, and clarifying that the fourth claim is brought under California Government Code section 815.2—the defendants again moved to dismiss. Dkt. Nos. 33, 36. Pursuant to Civil Local Rule 7-1(b), this matter is suitable for disposition without oral argument.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts

4

do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

Many of the problems in Paschal's FAC persist in the SAC. The SAC remains difficult to follow at times and includes superfluous allegations that are not relevant to his claims. It again makes passing references to other constitutional violations (i.e., of the Fourth and Fifth Amendments) without expressly asserting those claims (which would be too conclusory to proceed regardless). *See, e.g.,* SAC ¶¶ 135. It does not appear that Paschal took much, if any, of my prior Order to heart. The SAC is substantively identical to the FAC; the most notable change is the addition of allegations about California law on lodgers and San Francisco's Rent Ordinance. *See id*. ¶¶ 110-120. It again asserts a Title VI claim against Sanchez, despite my dismissal of that claim with prejudice. *See id*. ¶¶ 159-174; First MTD Order at 1:21-23. Most importantly, the SAC does not include new allegations that plausibly state Paschal's claims.

Although the SAC is substantively identical to the FAC, and much of my prior analysis carries over, I will address each claim of Paschal's in turn.

### I. *MONELL*

Municipalities may be held liable under section 1983 when an official policy or custom causes a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). But local governments may not be sued under section 1983 for injuries inflicted solely by their employees or agents. *Id*. at 694. To state a *Monell* claim, a plaintiff must plausibly plead the following: "(1) that [he] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to [his] constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Torres v. Saba*, No. 17-CV-06587-SI, 2019 WL 111039, at *6 (N.D. Cal. Jan. 4, 2019) (citations omitted).

Paschal attempts to plead a *Monell* claim against the City, again alleging that the denial of his short-term rental certificate violated his First Amendment rights to (1) run a "lodger" business that provided a way for him to "engage as the 'grio'" of San Francisco's Fillmore District and (2) find roommates. *See* SAC ¶¶ 127, 129.[2] As I stated in my previous Order, although the First Amendment prohibits the government from enacting laws that abridge the freedom of speech, the Supreme Court has distinguished between "restrictions on protected expression" and "restrictions on economic activity or, more generally, on nonexpressive conduct." *See* First MTD Order at 6:14-19 (citing U.S. Const. amend. I; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). In the Court's words, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567.

The City's short-term residential rental provisions regulate economic activity, not speech. As defendants assert, denying Paschal's permit did not limit what he could or could not communicate or restrict when, where, or how he could speak but merely prevented him from renting out his property for short-term stays, which is conduct, not speech. *See* Mot. to Dismiss ("MTD") [Dkt. No. 36] 10:1-2.

---

[2] According to the SAC, "[g]rio is a word that means storyteller in Africa," and in the United States refers to a "person telling stories about the histories of African-American communities where they lived." SAC ¶ 127.

6

Paschal contends that he has a right to run a business based on storytelling—that by renting out his home through Airbnb, he can work as a grio and "give . . . tourists tours of the places that held significant civil rights movements and historic jazz spots" in San Francisco. *See* SAC ¶¶ 127-128. But, as before, "the connection between that storytelling and the denial of his short-term rental certificate is incidental at best." First MTD at 7:11-13. Nothing on the face of the municipal provisions limits when, where, or how someone can speak. Rather, they state the requirements that San Francisco residents must meet to rent their homes on a short-term basis. This is a regulation of nonexpressive, economic activity—not speech. *See Sorrell*, 564 U.S. at 567. I said this when I dismissed the FAC, and the SAC does not add any allegations to this cause of action that change my analysis, including any that support a reasonable inference that the economic regulations at issue "target certain types of speech and thereby raise the specter of government discrimination." *See Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 962 (9th Cir. 2021) ("economic regulations can still implicate the First Amendment when they are not 'generally applicable' but instead target certain types of speech and thereby raise the specter of government discrimination").

Nor does the SAC plausibly allege that the municipal policy violated Paschal's right to choose his roommates. The Supreme Court has held that "[t]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights," and that to determine whether a relationship is so protected, courts consider the "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545-46 (1987). The Ninth Circuit has held that the "roommate relationship easily qualifies," as people "generally have very few roommates; they are selective in choosing roommates; and non-roommates are excluded from the critical aspects of the relationship, such as using the living spaces." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1220-21 (9th Cir. 2012).

The problem remains that the SAC alleges that denying Paschal's short-term rental application "affected his *business* relationships, not his roommate relationships." *See* First MTD Order at 8:5-6 (emphasis in original); *see also Fair Hous.*, 666 F.3d at 1220 ("a business

1   transaction between a tenant and landlord is quite different from an arrangement between two
2   people sharing the same living space"). Like the FAC, the SAC repeatedly references Paschal's
3   short-term rental "business." *See, e.g.,* SAC ¶¶ 1 (describing "attempts to shut down a family
4   business"); 32-34 (describing the Paschals' efforts to "open up a short term rental business to
5   lodgers from all over the world," and the "purpose of this business"); 127 (describing Paschal's
6   right "to run a 'lodger' business," and that "[t]his business is a way for [him] to engage as the
7   'grio'" of the Fillmore District). The SAC does not describe a roommate relationship between
8   Paschal and the lodgers; although they may share living spaces, the relationship is based on a
9   business transaction.

The SAC alleges that under California Civil Code section 1946.5, people who use Airbnb to rent rooms in San Francisco are "automatically given tenant rights because Mark Paschal is forced to live with the people he rents rooms to." *See id*. ¶¶ 111. It further alleges that the City "mandates that every person using Airbnb for a 'short-term rental' now must use Airbnb to become a 'boarding house'" because the City believes "it would keep rents lower within San Francisco." *See id*. ¶¶ 110, 115. These allegations are difficult to follow, but to the extent that Paschal alleges that boarding houses "give[] lodgers 100% tenant rights because they are considered roommates," those allegations are too conclusory to save his claim. *See id*. ¶ 118.

Paschal's *Monell* claim fails because he has not shown a plausible constitutional violation. *See Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (*Monell* claims are "contingent on a violation of constitutional rights") (citation omitted). It is DISMISSED.

## II.     SECTION 1983

Section 1983 establishes a cause of action for violations of the federal Constitution and laws by officials acting under the color of law. *See* 42 U.S.C. § 1983. It is not a standalone source of substantive rights; rather, it provides a "method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

Paschal's section 1983 claim is based on an alleged "violation of the Equal Protection Clause granted in Title VI." *See* SAC ¶ 143. Although it remains unclear whether he relies on the Fourteenth Amendment or Title VI, my analysis is the same for each. *See N.Y. through Yu v. San*

*Ramon Valley Unified Sch. Dist.*, No. 17-CV-03906-MMC, 2018 WL 4599680, at *6 (N.D. Cal. Sept. 21, 2018) ("Title VI proscribes only those racial classifications that would violate the Equal Protection Clause; consequently, where a plaintiff's claim that he was deprived of equal protection on account of his race fails on its merits, a Title VI claim based on the same facts likewise fails.") (citation and quotation marks omitted).

A plaintiff asserting a claim under the Equal Protection Clause must show that he was intentionally treated differently than other similarly situated individuals. *Recinto v. U.S. Dep't of Veterans Affs.*, 706 F.3d 1171, 1177 (9th Cir. 2013). The plaintiff must show that "the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Purposeful discrimination arises when the decisionmaker acts "because of, not merely in spite of, the action's adverse effects upon an identifiable group." *See Iqbal*, 556 U.S. at 676-77 (citation and modifications omitted).

There are no allegations in the SAC that plausibly support that the defendants acted with an intent or purpose to discriminate against Paschal based upon his race. Paschal alleges that "[i]ntentional discrimination happened against Mark Paschal when Mr. Putra used a photo of" Paschal and his sister "as a reason to 'flag' Mark's ability to renew his business permit." *See* SAC ¶ 144. There is no support for the allegation that Putra flagged the application for that reason and the SAC is clear that the OSTR denied Paschal's application because it appeared that he did not live at the Hayes Street residence. *See id*. ¶ 78-79, Ex. 4. There are no other allegations, besides Putra seeing the photo, to buttress the allegation of intentional discrimination.

Nor has Paschal plausibly alleged that he was treated differently from similarly situated individuals. He again relies on contentions about Airbnb's founders, which fail for the same reasons as they did before: the circumstances presented by the Airbnb founders and Paschal are not remotely comparable. *See id*. ¶¶ 146-151; First MTD Order at 10:22-11:3. As I explained in my prior Order, Paschal does not allege that Airbnb's founders were granted a short-term rental certificate while he was not. *See* First MTD Order at 10:26-27. His allegations that Airbnb operated for six years "before they became legal" and "did so without penalty" predate both the

city regulations at issue and Paschal's attempts to obtain a short-term rental certificate, which both began in 2015. *See* SAC ¶¶ 21, 147-148; S.F. Ord. No. 218-14 § 4(b); First MTD Order at 10:27-11:3. And, as alleged in the SAC, Airbnb is a multi-billion-dollar company, while Paschal is a small business oner. *See* SAC ¶¶ 21, 50.

In his opposition, Paschal again notes that the OSTR told him that it does not keep statistics of how short-term rental policies are enforced against black and white homeowners, and that in lieu of such data, "the evidence of racial discrimination presented is how [San Francisco] treated the white founders of Airbnb versus how they treated the Paschal family." *See* Oppo. [Dkt. No. 40] 20:18-21:12. While perhaps there are other comparisons that could plausibly allege an equal protection claim, this one does not.

To show that he was racially discriminated against, Paschal relies on allegations that (1) Sanchez appointed himself the adjudicator of his racial discrimination complaint; (2) the OSTR asked him questions that "are asked to black people way more than white people" and were not asked by any other applicants or appellant but meant to harass" Paschal; and (3) his request for a meeting with the mayor was denied. *See id*. at 22:16-23:13; SAC ¶¶ 94-95, 150. But the SAC undercuts these allegations. It alleges that Sanchez appointed himself the adjudicator of Paschal's appeal of his permit denial, not his complaint against the OSTR, and that no one investigated his discrimination complaint. *See* SAC ¶¶ 3, 10 ("The City did not investigate this allegation, did not call Mr. Paschal for an interview or follow up after the claim of discrimination."). As alleged, the questions that Sanchez asked during the appeal were focused on whether a stove in Paschal's home was permitted. *Id*. ¶¶ 92, 94. This appears to be within the bounds of the OTSR's purview, as residents who offer their homes as short-term rentals must demonstrate that their home "is not subject to any outstanding . . . Code enforcement." S.F. Admin. Code § 41A.5(g)(1)(H). And Sanchez told Paschal (in an email attached to the SAC) that he could not schedule a meeting between Paschal and the mayor because he did not have the access or ability to do so. *See* SAC ¶¶ 75-77, Ex. 3.

I cannot reasonably infer from Paschal's allegations that he was intentionally treated differently from similarly situated individuals because of his race. He has not alleged a violation

10

of the Equal Protection Clause or Title IV, upon which his section 1983 claim relies. The section 1983 claim is also DISMISSED.

### III. TITLE VI

Under Title VI of the Civil Rights Act, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000(d). Title VI "only extends to cases of intentional discrimination and not disparate impact." *West v. City & Cnty. of San Francisco*, No. 21-CV-02370-EMC, 2022 WL 1556415, at *10 (N.D. Cal. May 17, 2022) (citations omitted). To state a claim under Title VI, a plaintiff must allege that: "(1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994) *overruled in part on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001).

Paschal continues to style his Title VI as a retaliation claim, not a discrimination claim. *See* SAC ¶¶ 159-174. It remains unclear whether the Ninth Circuit recognizes such a claim; as I explained in my prior Order, "it does not appear, based on my own review of the case law, that the Ninth Circuit has expressly articulated" what the elements of it are. *See* First MTD Order at 11:18-20. I instructed the parties to specifically address this should Paschal's amended complaint include a Title VI claim based on retaliation. *See id*. at 11 n.4.

Paschal has not identified any Supreme Court or Ninth Circuit precedent expressly stating that a Title VI claim may arise from retaliation. He again contends that it is "well-settled that Title VI supports retaliation claims," but generally relies on out-of-circuit decisions in support. *See* SAC ¶ 172. He points to one 2005 case from the Eastern District from Washington, which stated that "retaliation claims are recognized under Title VI." *See id.*; *see also* Oppo. at 24:17-25:20 (both citing in part *Gutierrez v. Wash. Dep't of Soc. & Health Servs.*, No. CV-04-3004-RHW, 2005 WL 2346956, at *5 (E.D. Wash. Sept. 26, 2005)). But the court made that conclusion based on the Supreme Court's recognition of an implied cause of action under Title IX for retaliation and the Court's consistent interpretation of Title IX and Title VI. *See Gutierrez*, 2005 WL 2346956, at

11

\*5. I too relied on *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173-74 (2005) and the substantial similarities between Title IX and Title VI in my previous consideration of Paschal's claim. *See* First MTD Order at 11:18-12:17.

Assuming that such a claim does exist, Paschal's Title VI claim focuses on alleged actions by Sanchez. *See* SAC ¶¶ 159-174. As I made clear in my prior Order, this claim cannot proceed against Sanchez because he is not a "program or activity receiving federal financial assistance." *See* First MTD Order at 13:7-15 (citing *West*, 2022 WL 1556415, at \*10) ("Title VI claims cannot be asserted against individual defendants because they are not the ones receiving federal funding."). Paschal alleges that he was "harmed as a protected class" and that black people "are impacted by the rules and procedures." *See* SAC ¶ 174. But if he intends to assert this claim against the City and the OSTR, his allegations are too conclusory to support it. I provided Paschal notice of these deficiencies in my prior Order. *See* First MTD Order at 13:7-15. His retaliation claim is DISMISSED.

### IV.   PUBLIC ENTITY LIABILITY

Paschal does offer some clarity around his fourth cause of action, which is now asserted under California Government Code section 815.2. *See id*. ¶ 175. Under section 815.2, "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a). It further provides that "[e]xcept as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." *Id*. § 815.2(b).

Paschal contends that the "City is vicariously liable for the acts of its employee[s], like Mr. Putra," that "[t]hey wrongfully denied his application to renew his short term rental business," and that the employees' "act, omission, failure to act, doings or gross negligence is the primary factor" in harming Paschal. *See* SAC ¶¶ 176, 179, 181.

Paschal has not plausibly alleged an act or omission by Sanchez or Putra that would give rise to a cause of action against them. Moreover, Paschal does not address the defendants'

argument that they are immune "from any tort liability for any alleged injury caused by the denial or revocation of, and/or refusal to issue [Paschal] a short-term rental certificate" under the state's Tort Claims Act. *See* MTD at 20:10-28. In part, the Tort Claims Act shields public entities from liability for

> an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or an employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked.

Cal Gov't Code § 818.4. Paschal does not expressly mention this fourth cause of action in his opposition, let alone respond to the defendants' argument. *See generally* Oppo. He has otherwise not plausibly alleged a claim under section 815.2. It too is DISMISSED.

## CONCLUSION

The SAC does not make any substantive attempt to cure the deficiencies that I identified when I dismissed the FAC. *See Moore*, 885 F.2d at 538. Some of those deficiencies, including the reassertion of a claim that was dismissed with prejudice, are repeated without any explanation. Given the basis for Paschal's claims, amendment would be futile, as the allegations of other facts could not cure the remaining deficiencies. *See id*. The defendants' motion to dismiss is GRANTED. Paschal's claims are DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated: February 10, 2023



William H. Orrick
United States District Judge

13